TELEDYNE INDUSTRIES, INC., d/b/a Teledyne Water Pik, a California Corp., Plaintiff,

v.

WINDMERE PRODUCTS, INC., a Florida Corporation, et al., Defendants.

No. 76–1931–Civ–JLK.

United States District Court, S. D. Florida, Miami Division.

April 29, 1977.

Duane Burton, Burton & Darr, Denver, Colo., Peter L. Nimkoff, Miami, Fla., Hugh Drake, Fort Collins, Colo., for plaintiff.

Robert C. Ward, Miami Beach, Fla., Adams, George, Wood, Lee & Schulte, Miami, Fla., Harvey B. Jacobs, Jr., Washington, D. C., for defendants.

## MEMORANDUM OPINION

JAMES LAWRENCE KING, District Judge.

Teledyne Corporation manufactures and markets a wall mounted adjustable spray nozzle or showerhead known as the "Water Pik SHOWER MASSAGE" Model SM–2. The chrome-colored unit is of a distinctive shape and appearance, and the internal mechanism of the nozzle is protected by three United States patents. Windmere Corporation began the importation and marketing of a device with a very similar appearance and virtually identical internal parts. Teledyne brought suit against

Windmere and herein seeks a temporary injunction to prevent the marketing of the Windmere product, on the grounds that the Windmere product infringes Teledyne's United States patents, in violation of 35 U.S.C. Section 271(a), and the grounds that the similarity of appearance of the Windmere product constitutes unfair competition by creating confusion as to its origin, in violation of 15 U.S.C. 1051, *et seq.* and state unfair competition laws. Jurisdiction is founded on 28 U.S.C. Sections 1338(a), 1391, and 1400(b), and the court has pendent jurisdiction over the state unfair competition counts.

## PROPRIETY OF A PRELIMINARY INJUNCTION

■ A preliminary injunction is an equitable remedy available at the sound discretion of the District Court. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Factors that must be evaluated in granting a preliminary injunction are (1) likelihood of success on the merits; (2) irreparable injury; (3) competing equities; and (4) public interest. *Mount Sinai Medical Center v. Mathews,* 425 F.Supp. 5 (S.D.Fla.1976), *Allison v. Froehlke,* 470 F.2d 1123 (5th Cir. 1972).

Plaintiff seeks this preliminary injunction on grounds of both patent infringement and unfair competition. An injunction grounded in patent infringement would prevent the sale or marketing of spray nozzles with infringing internal structure, regardless of their appearance. Inversely, such an injunction would not prevent the sale of units that appear identical to plaintiff's if their internal structure were different. An injunction grounded in unfair competition would have precisely the opposite effect—that is, it would prevent sale of units confusingly similar in appearance even though their internal structure differed, but it would not prevent the sale of units with duplicate internal structure if their appearance was dissimilar. Of course an injunction grounded on both patent infringement and unfair competition would prevent the sale of units with infringing internal structure *or* confusingly similar appearance.

## THE PATENT CLAIMS

■ In applications for preliminary injunctions in patent cases, there is authority in some circuits that "in the absence of long acquiescence or adjudication [of the patent] an injunction will not go. . . ." *Carter-Wallace, Inc. v. Davis-Edwards Pharm. Corp.,* 443 F.2d 867 (2d Cir. 1971), quoting *Rosenberg v. Groov-Pin Corp.,* 81 F.2d 46, 47 (2d Cir. 1936) (L. Hand, J.). Judge Hand stated the rationale behind this doctrine thusly:

> Examiners have neither the time nor the assistance to exhaust the prior art; nothing is more common in a suit for infringement than to find that all the important references are turned up for the first time by the industry of a defendant whose interest animates his search. It is a reasonable caution not to tie the hands of a whole art until there is at least the reasonable assurance which comes from such an incentive. *Id.*

This idea—that an in-depth search for prior art will be made most vehemently by an adversary and not by the Patent Office—is in itself a sound principle.

Judge Hand's idea, however, cannot in itself support a doctrine as conservative as that expressed in *Carter-Wallace.* "[L]ong acquiescence or adjudication" are not the *only* measures of insurance that all prior art has been dredged up before the court. In this action, the parties have been before the court almost six months. Numerous hearings on the issue of patent validity and infringement have been held. The parties have vehemently presented their positions. Both parties have submitted voluminous affidavits of experts arguing the technical merits of plaintiff's patents and the pertinent prior art. Lengthy depositions of these experts have been filed, during which they were subject to provocative cross-examination. After all this, the court is not so unfamiliar with the Teledyne patents and the prior art that it cannot rule upon

the *probable* validity of the patents or upon their *probable* infringement.

Defendant urges that the widely-recognized "judicial mortality of patents" renders plaintiff's success on his patent claims unlikely. In this connection, defendant has carefully cataloged recent patent cases in this circuit and found that barely 37% survived the courtroom battle. Such statistics, while interesting in passing, are *absolutely irrelevant* to the issue of validity *in this case*. The court cannot see how the fate of other patents is related to the fate of this one at all. The high mortality rate may of course be explained by Judge Hand's observations on the interested opponent's thorough search of the prior art, but as the court said before, Hand's explanation alone is not cause to bar a preliminary injunction if there is evidence in this case of adversary search of the prior art.

■ In the Fifth Circuit the standard of review to be applied in applications for preliminary injunctions in patent cases was stated clearly in *Eli Lilly & Co. v. Generix Drug Sales*, 460 F.2d 1096, 1099 (5th Cir. 1972), aff'g. 324 F.Supp. 715 (S.D.Fla.1971): "The burden is ordinarily on the party seeking preliminary injunctive protection in a patent infringement suit to demonstrate beyond question that the patent he sues on is valid and infringed, as well as showing that other equitable grounds are present." The court must now consider whether plaintiff has met this burden.

A. PATENT VALIDITY

■ Ordinarily, a patent duly issued by the Patent Office is entitled to the presumption of validity. 35 U.S.C. Sec. 282. This presumption is controverted somewhat but not removed by the fact that the patent has not been previously adjudicated valid. Other facts may reinforce the presumption, however. Although this patent is relatively new and has not been the subject of long-standing acquiescence (as was the patent held presumptively valid in *Eli Lilly*),

nevertheless plaintiff's invention appears, from the reaction it has caused in the marketplace, to be a significant step forward in the art. It has been a tremendous commercial success. Numerous favorable comments in trade and public publications have been introduced into evidence. Other manufacturers have sought plaintiff for licensing. Furthermore, until defendant's activity, plaintiff was the sole source of spray nozzles of this type. Even though defendant introduced several competing spray nozzles that advertised "massaging" or "pulsating" action, none, save defendant's, appeared to look like or work like the SM–2. Finally, defendant has paid plaintiff the "faithful tribute of imitation." This evidence suggests that in the brief time since its introduction, plaintiff's device has been treated by all, except defendant, as fully protected under the patent laws.

1. *Patent 3,762,648*

This patent, issued October 2, 1973 to Siegmund Deines, John Trenary, et al., is directed to a spray nozzle which delivers an intermittently interrupted or pulsating spray useful, for example, in a shower. The frequency of pulses and the volume of the spray may be adjusted by the user, independent of the water supply pressure. To achieve this end, water passing through the device is divided into two flow paths which are recombined prior to discharge through groups of nozzle orifices. Water flowing through one of the flow paths is directed axially against a turbine blade assembly to drive a rotatable valve rotor at a rotary speed dependent upon the pressure of water following this flow path. The second flow path bypasses the turbine blades, and hence water following the second path does not contribute the rotary speed of the valve rotor. By adjustably throttling flow through one of the flow paths, the rotary speed of the valve rotor may be varied independently of the supply pressure. Flow of water to each group of

nozzle orifices is cyclically interrupted by the rotating valve rotor which connects only a portion of the orifices to the supply at a given time.

Plaintiff's application to the patent office discloses prior references Erwin (No. 2,878,-066), Heitzman (No. 3,473,736 and 3,568,-716), and others.

Defendant alleges that claims 1 and 12 of Teledyne's patent No. 3,762,648 are "anticipated" by a combination of the Lauter Patent 1,101,804 and the Erwin Patent 2,878,066. "Anticipation" is indeed a ground for denying or invalidating a patent under 35 U.S.C. Sec. 102(a), which states essentially that a prior patent of an invention precludes a later patent of the same invention. The courts have held that anticipation refers only to inventions disclosed in a *single* prior patent, not to combinations of inventions that may be inferred from a variety of previous patents. *See Walker v. General Motors Corp.*, 362 F.2d 56, 58 (9th Cir. 1966).

What defendant undoubtedly meant to allege is that in light of the teachings of the Lauter and Erwin patents, plaintiff's first patent was "obvious at the time the invention was made to a person having ordinary

skill in the art . . . ." 35 U.S.C. Sec. 103.

■ Many decisions have established the guidelines for determining whether or not a particular invention was *"obvious at the time the invention was made."* One well-established guideline avoids the tendency to combine disclosures of several prior art patents in the light of the teachings of the patent *sub judice* (sometimes termed hindsight vision). To eliminate such hindsight modification of the prior art, it has generally been held that where an accused infringer attempts to build up a hypothetical anticipation of the patented invention by the selection of elements from two or more independent reference patents, he must justify his action by showing that one or more of the reference patents contains a teaching, or at least a suggestion, that such a combination would be a desirable thing to do. Thus, in *In re Pennington*, 241 F.2d 750, 753, 44 CCPA 789 (1957), the Court of Customs and Patent Appeals stated the rule:

> It is well established that, where two or more prior art references are combined to negative patentability, the test to be applied is: does the prior art suggest doing what an applicant has done.

The District Court for the District of Columbia, in the same situation in *Tietig v. Ladd*, 228 F.Supp. 637, 641 (D.D.C.1964), *quoting In re Shaffer*, 229 F.2d 476, 43 CCPA 758 (1956), ruled:

> It has been continually held that references may not be combined where "there is no suggestion in either of the references that they can be combined to produce appellant's result."

U.S. Patent No. 1,101,804 was issued to Ignatz Lauter for a "Water Massage Device" in 1914, as pictured on the following pages:

I. LAUTER.
WATER MASSAGE DEVICE.
APPLICATION FILED OCT. 19, 1911.

1,101,804.

Patented June 20, 1914

2 SHEETS—SHEET 2.

In the Lauter construction, flow of water to each group of nozzle orifices is cyclically interrupted by the rotating valve rotor (including annular segment ports 27 thereon) which connects only a portion of the orifices to the supply at a given time.

U.S. Patent No. 2,878,066 was issued to Weldon C. Erwin for a "Shower Head" in 1959, as pictured below:

March 17, 1959 W. C. ERWIN 2,878,066

SHOWER HEAD

Filed June 12, 1956

FIG. 1

FIG. 3

FIG. 4

FIG. 5

In the Erwin device water is directed axially against an impulse-type turbine assembly which is connected to a rotary valve. The valve rotates and intermittently covers certain discharge orifices producing a pulsating spray. The unit embodies a single flow path, so speed of the turbine and the valve depends exclusively on inlet water pressure.

It was suggested by defendant's expert that a "combination" of the Lauter and Erwin devices, as illustrated below, rendered plaintiff's invention obvious.

Plaintiff's expert testified in response that the hybrid device would offer no improvement over the original Lauter patent and in fact would fall far short of the Teledyne invention. Furthermore he explained that the Lauter-Erwin combination as shown would be inoperable entirely. He reasoned that Lauter's pressure wheel, marked 19 in the Lauter diagram, is of the "reaction" type and requires substantial pressure drop between its upstream side and its downstream side to operate successfully. The Erwin device, in contrast, uses an "impulse" type rotor, marked 27 in the Erwin diagram, that does not require a pressure drop across its face but is pushed by water jets which direct the input stream against vanes on the rotor. Furthermore, in the Erwin device (and in the hybrid as suggested) full water pressure is *required* just above the discharge orifices (21 in Erwin and 20 in the hybrid) to produce satisfactory spray therefrom. Accordingly, plaintiff asserts, the use of the Lauter-type reaction wheel with the Erwin-type discharge orifices is impossible. Further testimony was introduced that the rotor in the hybrid device would experience prohibitive friction against the end plate (marked 17).

During cross-examination, defendant's expert could not respond to plaintiff's specific and detailed objections to the viability of his hybrid device. He demonstrated unfamiliarity with the principles of operation of the Lauter device:

"Q Let me ask this: Does rotor 19 require a pressure drop across it to make it work?

"A I do not know.

"Q Do you know whether or not rotor 19 is a reaction turbine or an impulse turbine?

"A I would suspect from my familiarity with the words 'reaction' and 'impulse' that rotor 19 is a reaction turbine.

"Q What would you say the pressure on the inside surface would be relative to the upstream side of the rotor 19?

"A I could not say."

Accordingly, the court is of the opinion that the hybrid device as conceived by the defendant in no way suggests that plaintiff's first patent was non-obvious in view of the Lauter and Erwin teachings.

Defendant next argues that Teledyne's first patent is invalid as obvious in view of the teachings of Ellis. U.S. Patent 763,269, issued June 21, 1904 to Mark St. Clair Ellis for a "Steam Cleaner" was not cited to the patent office in Teledyne's first application. As pictured below, Ellis discloses a cleaning nozzle for water or other fluids in which the total fluid flow is divided into first and second flow paths, much as in the Teledyne patent. The first path leads to turbine blades on a valve rotor and the second flow path leads to intermittently opened and closed flow passages on the rotor. Flow control means are provided for adjustably throttling flow through the first flow path so as to vary the rotary speed of the valve rotor independently of the supply pressure.

[See following illustration]

No. 763,269.

PATENTED JUNE 21, 1904.

M. ST. C. ELLIS.
STEAM CLEANER.
APPLICATION FILED AUG. 11, 1903.

NO MODEL.

Fig. 1.

Fig. 2.

Mark St. Clair Ellis,

Witnesses

By Dickinson & Fisher
his Attorneys

The Ellis device, however, lacks that essential feature of the Teledyne patent wherein water from the first and second flow paths is recombined *prior* to passage through the rotary valve. In the Ellis disclosure, the fluid is indeed recombined, but not before the second flow path has been passed through the "interrupter" or rotary valve. In view of Ellis, neither the desirability nor the technique of combining the first and second flow paths upstream of the rotary valve seems obvious.

### 2. Patent 3,801,019

This patent, issued April 2, 1974 to John Trenary, et al., is directed to a spray nozzle of the general type taught by Patent No. 3,762,648. It provides a third flow path bypassing the apparatus for producing the pulsating spray. Control means are provided for directing water (a) through only the third flow path to a second group of outlets from which the water is discharged as continuous streams, (b) through only the first and second flow paths in the manner of Patent No. 3,762,648, or (c) through all three flow paths in varying proportions such that water is discharged as a combination of continuous spray and pulsating spray. The more detailed claims are directed to the details of the control valve assembly for proportioning the flow between the three flow paths.

In its application for its second patent Teledyne's assignors cited the Heitzman patent, No. 3,568,716, as pertinent prior art.

Defendant suggests that the second Teledyne patent, No. 3,801,019, is anticipated by the Heitzman patent No. 3,568,716, issued to Charles J. Heitzman in 1971 for a "Turbine Driven Pulsating Device." Patent No. 3,568,716 to Heitzman is significant in that it discloses a first flow path through which pulsating flow is directed to a first group of outlets (single outlet 34), a second flow path through which steady flow is delivered to a second group of outlets (downstream ends of 35), a rotatable valve rotor for cyclically interrupting flow through the first flow path, and control means for adjustably dividing flow between the first and second flow paths to produce a steady, pulsating, or mixed discharge.

Thus as pictured below, the Heitzman device provides for a pulsating discharge from a suitable outlet with turbine driven valving. Like the Teledyne product, it is selectively controllable for producing a pulsating, steady or mixed discharge, and also for regulating the volume of the discharge.

See Photo on next page.

FIG. 1

FIG. 5

FIG. 6

FIG. 2

FIG. 3

Inventor:
Charles J. Heitzman

his Attorney

FIG. 4

FIG. 7

Heitzman employs two distinct flow paths, one of which is interrupted by the turbine valve and one of which is not so interrupted. By varying the relative strengths of these paths, the Heitzman device is "selectively controllable for . . . pulsating, steady, or mixed discharge." The second Teledyne patent appears superficially to adopt this very mechanism. However, the Teledyne patent incorporates a significant difference. In Heitzman the first and second flow paths are separated *after* the turbine is driven; that is, the *total* fluid flow always drives the turbine. Consequently, it is impossible to regulate the *speed* of the Heitzman turbine (and thus the frequency of pulsation) independently of the input water pressure. In contrast, the Teledyne turbine is driven *after* the fluid flow paths diverge, and thus regulation of one path regulates the speed of the turbine independently of the input water pressure.

Defendant's expert acknowledged this distinction in deposition:

"Q Can you vary the pulsation rate of the Heitzman device independent of the water pressure?

 * * * * * *

"A No. * * *

"Q * * * Can you vary the pulsation rate of the Teledyne Water Pik device . . . independent of the water pressure?

 * * * * * *

"A You can adjust the Teledyne device and change the pulsation rate without varying the controls to the inlet of the device."

Accordingly, plaintiff's expert opined that claims 1 and 4 of the second Teledyne patent envisioned significant differences in construction and theory from the Heitzman patent.

Furthermore the Heitzman patent was disclosed to the Patent Office in Teledyne's application for the second patent. Presumptively therefore, the Patent Office considered fully the Heitzman teachings in its decision to grant the Teledyne application. This fact that the prior art cited was before the Patent Office for consideration strengthens the presumption of validity accorded this second patent. *See Modern Products v. Drachenberg,* 152 F.2d 203 (6th Cir. 1945) *cert. denied* 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030 (1946), *Schnell v. Albright-Nell,* 348 F.2d 444 (7th Cir. 1965), *cert. denied* 383 U.S. 934, 86 S.Ct. 1062, 15 L.Ed.2d 851 (1965), *reh. denied* 384 U.S. 914, 86 S.Ct. 1334, 16 L.Ed.2d 366 (1965).

Defendant cites additional prior art in arguing the invalidity of Teledyne's second patent. Patent No. 3,741,481 to Bauer was called to the attention of the Patent Office during prosecution, but according to defendant this patent was never considered by the Patent Office. The Bauer patent is of interest in that it discloses a first flow path through which pulsating flow is delivered to a first group of outlets, a second flow path through which steady flow is delivered to a second group of outlets, inlet means, means for pulsing the flow through the first flow path, and control means for directing flow to a selected one of the first and second flow paths.

However, Bauer discloses a device using *no movable parts* for producing a pulsating spray. In fact, Bauer criticizes such an approach (Col. 1, line 17). All of plaintiff's patents rely on intricate mechanical movement of various components to generate a pulsating spray.

Patent No. 2,726,120 to Bletcher is similar to the Bauer patent in that it has a second flow path bypassing a centrally located interrupter for interrupting and breaking up the flow of water through a first flow path. This patent is of particular interest in that one version is capable of providing either steady or interrupted flow while the embodiment of another version is capable of providing either steady or mixed flow.

However, the device in Bletcher does not result in a pulsating spray nor a controlled pulsating spray; rather, Bletcher seeks to produce droplets of water emulating rain. Accordingly, the court concludes that in view of the prior art presented, plaintiff has demonstrated that its second patent is probably valid.

### 3. *Patent 3,958,756*

This patent, issued May 25, 1976 to John Trenary, et al., describes a spray nozzle of the same general type as Patent 3,801,019 but of improved performance, one that is less restrictive as to manufacturing tolerances. Specifically, it includes various improved sealing elements separating the flow paths to the outlets delivering the pulsating spray from the flow paths to the outlets delivering the nonpulsating spray.

Sole pertinent prior art disclosed in this application was the previous Teledyne patent.

Defendant attacks the validity of the third Teledyne Patent, No. 3,958,756, by alleging that the patent is obvious in light of the two prior Teledyne patents. Plaintiff argues that a critical advancement embodied by patent number three is the configuration of the "sealing washer." This washer fits around the end plate (through which the discharge orifices for "pulsating spray" are cut), between the plate and the surrounding housing. Notches are cut in the housing which appear as holes when the sealing washer is pressed tightly against the housing. Through these holes a continuous spray is directed from a suitable flow path within the device. Since the sealing washer comprises one side of each hole (the other side being the housing), the configuration of the washer is critical to the resulting spray pattern from the holes. Teledyne claims that the third patent discloses a superior "N" shaped sealing washer that seals tightly and uniformly by employing water pressure in the unit to augment its seal. It further claims that the exact dimensions of the washer are critical and grounds in themselves for patentability. Defendant has cited no prior art disclosing a similar washer. It is noteworthy that the Windmere SHOWER MAGIC employs an "N"-

shaped washer exactly as disclosed by this third patent. Accordingly, the court finds that plaintiff has met the burden of demonstrating likely success on the question of validity of the third patent.

1. 1. A spray nozzle comprising a hollow housing having a fluid inlet at one end, an end wall at the opposite end of said housing, said end wall having a plurality of fluid discharge orifices extending therethrough in a symmetrical pattern about a central axis of said housing, a valve member mounted in said housing for rotation about said axis at a location between said inlet and said end wall, said valve member having a valve port establishing fluid communication between said inlet and a portion only of said orifices at all rotative positions of said valve member, flow passage means in said housing between said inlet and said valve port having separate first and second flow passages for conducting fluid from said inlet to said port, turbine means on said valve member for driving said valve member in rotation in response to the flow of fluid through said first flow passage, and control means for adjustably throttling flow through one of said flow passages to thereby vary the portion of the total flow which passes through said first flow passage.

12. A spray nozzle comprising a housing having an internal chamber defined in part by a first wall of said housing, means defining a plurality of discharge orifices extending through said first wall from said chamber and arranged in a plurality of groups uniformly spaced from each other within an annular band having a central axis, a valve member mounted within said chamber for rotation about said central axis means defining a valve port in said valve member offset from said axis and establishing fluid communication between said chamber and a segment of said annular band to place said groups of orifices successively in communication with said chamber upon rotation of said valve member, coupling means defining an inlet to said chamber and operable to couple said nozzle to a source of fluid under pressure, means in said housing defining a first and a second flow passage for conducting fluid from said inlet to said discharge orifices via said port, drive means coupled to said valve member in rotation in response to the flow of fluid through said first flow passage, and control means for adjustably throttling flow through said second passage.

2. Claims Alleged Infringed:

1. A spray nozzle comprising:

a hollow housing having a fluid inlet and a first and a second group of fluid spray discharge outlets;

means in said housing defining first and second flow passages in said housing extending from said inlet respectively to said first and said second groups of discharge outlets;

## B. PATENT INFRINGEMENT

Teledyne alleges that the Windmere SHOWER MAGIC infringes, inter alia, claims 1 and 12[1] of U.S. Patent 3,762,648, claims 1 to 4[2] of Patent 3,801,019, and

a rotary valve member mounted for rotation in said first flow passage operable when rotated to cyclically interrupt flow from said inlet to said first group of outlets and cause a pulsating fluid spray to be discharged therefrom;

blade means on said valve member for driving said valve member in rotation at a rate proportional to the rate of flow of fluid through said first flow passage;

said second flow passage bypassing said valve member and communicating directly with said second group of outlets whereby fluid flowing through said second flow passage is discharged from said second group of outlets in continuous streams;

and control means for adjustably dividing flow from said inlet between said first and said second passages.

2. A spray nozzle as defined in claim 1 wherein said control means includes:

a plate mounted in said housing between said inlet and said outlets and having spaced first and second openings therethrough respectively establishing communication between said inlet and said first and said second flow passages;

and shutter means slidably mounted on said plate for coordinated movement into and out of overlying flow blocking relationship with said openings between a first position wherein said second opening is blocked and all flow from said inlet is directed through said first opening and a second position wherein said first opening is blocked and all flow from said inlet passes through said second opening, movement of said shutter means from one of said positions toward the other progressively decreasing the flow through one of said openings while increasing the flow through the other of said openings.

3. A spray nozzle as defined in claim 2 which further includes means defining a third flow passage extending from a third opening in said plate to said valve member independently of said first passage, said shutter means being movable to a third position located on the opposite side of said second position from said first position, said shutter means blocking said third opening when in said second position and progressively uncovering said third opening upon movement from said second position toward said third position to adjustably divide flow from said inlet between said first and third passages while maintaining said second opening blocked.

4. A spray nozzle comprising:

a housing having a fluid inlet and a first and a second group of fluid spray discharge outlets;

means in said housing defining a first flow path from said inlet to said first group of outlets

claims 1, 9 and 13 [3] of Patent 3,958,756. Defendant does not deny infringement of any claims except 1 and 12 of the first patent. After careful examination of the SHOWER MAGIC unit entered into evidence by defendant and detailed consideration of the component-by-component analysis presented by plaintiff, the court concludes that the Windmere device likely infringes all of the United States patent claims above.

The most convincing demonstration of infringement is a side-by-side comparison of one disclosure (figure 3) of U.S. Patent 3,958,756 with an exploded view of the Windmere SHOWER MAGIC. The virtual identity of the internal parts, down to the last detail, is clear evidence that infringement of the third patent cannot legitimately be denied.

and a second flow path from said inlet to said second group of outlets;

pulsation means in said first flow path for cyclically interrupting the flow of fluid from said inlet to said first group of outlets and cause a pulsating spray to be discharged therefrom;

said second flow path bypassing said pulsation means to cause a continuous nonpulsating spray to be discharged from said second group of outlets;

and control means movably mounted on said housing and selectively positionable to variably apportion flow from said inlet between said first and said second flow paths to cause said nozzle to selectively discharge an all-pulsating spray, an all-continous spray or a combined spray consisting of both pulsating and continous spray components.

3. 1. In a spray nozzle that includes:

a housing having a fluid inlet and a first and second group of fluid spray discharge outlets;

means in said housing defining a first flow path from said inlet to said first group of outlets and a second flow path from said inlet to said second group of outlets;

pulsation means in said first flow path for cyclically interrupting the flow of fluid from said inlet to said first group of outlets and cause a pulsating spray to be discharged therefrom;

said second flow path bypassing said pulsation means to cause a continuous non-pulsating spray to be discharged from said second group of outlets;

and control means for adjustably dividing flow from said inlet between said first and second flow paths;

the improvement comprising:

a spray cup assembly having a tubular main body across one end of which extends an end wall, said main body having an external diameter less than the internal diameter of the end of said housing opposite said fluid inlet so that said spray cup assembly is received within that end of said housing;

means in said end wall defining said first group of outlets;

means defining an annular groove extending around the lateral exterior of said spray cup assembly and of predetermined width in the direction axially of said spray cup assembly;

means defining a series of slots in the internal wall of said housing at said end thereof, said slots extending in said direction and being distributed around the internal circumference of said wall;

a flow-directing plate mounted in said housing between said inlet and said outlets and having first and second openings therethrough respectively establishing communication between said inlet and said first and second flow paths, said first and second openings being located near the periphery of said plate and spaced apart around said periphery;

shutter means slidably mounted on said plate for coordinated movement into and out of overlying flow-blocking relationship with said openings between a first position wherein said second opening is blocked and flow from said inlet is directed through said first opening and a second position wherein said first opening is blocked and flow from said inlet passes through said second opening, movement of said shutter means between said positions progressively changing the amount of flow respectively delivered through each of said openings;

a generally tubular body constituting a portion of said housing and containing said pulsation means;

means defining first and second flow passages extending axially through said body and respectively constituting respective portions of individual different ones of said flow paths, said flow passages being adjacent to and spaced successively around the periphery of said body in communication with the respective ones of said first and second openings in said plate;

means defining an end wall of said body through which said second flow path extends;

means in said housing defining a mating wall through which said second flow path extends;

an annular washer sandwiched between said end wall and said mating wall and having means defining apertures through which said first and second flow paths respectively extend;

and a rib outwardly projecting from one of said walls into sealing engagement with said washer, said rib extending continuously around the general perimeter of said one wall and being disposed radially outward of one of said flow paths and radially inward of the

other of said flow paths.

and a seal of resilient material formed into the shape of a washer having an integral cross-section in said direction composed of a pair of legs apart by a connecting web, the length of one of said legs being at least approximately the same as said predetermined width of said groove, said seal being seated between said slots and said groove with said one leg disposed in said groove and the other leg extending across the open radially inner sides of said slots so as, together with said slots, to define said second group of outlets.

9. In a spray nozzle that includes:

a housing having a fluid inlet and a first and a second group of fluid spray discharge outlets;

means in said housing defining a first flow path from said inlet to said first group of outlets and a second flow path from said inlet to said second group of outlets;

pulsation means in said first flow path for cyclically interrupting the flow of fluid from said inlet to said first group of outlets and cause a pulsating spray to be discharged therefrom;

said second flow path bypassing said pulsation means to cause a continuous non-pulsating spray to be discharged from said second group of outlets;

and control means for adjustably dividing flow from said inlet between said first and said second flow paths;

the improvement comprising:

a flow-directing plate mounted in said housing between said inlet and said outlets and having first and second openings therethrough respectively establishing communication between said inlet and said first and second flow paths, said first and second openings being located near the periphery of said plate and spaced apart around said periphery;

means in one of said openings defining a counterbore extending therein from the inlet side of said plate;

a resilient annular seal element seated in said counterbore;

shutter means slidably mounted on said plate for coordinated movement into and out of overlying flow-blocking relationship with said openings between a first position wherein said second opening is blocked and flow from said inlet is directed through said first opening and a second position wherein said first opening is blocked and flow from said inlet passes through said second opening, movement of said shutter means between said positions progressively changing the amount of flow respectively delivered through each of said openings;

said shutter means including an annular ring from which project radially inward a plurality of shutter blades respectively spaced individually around the periphery of said ring, movement of said shutter means between said positions alternately covering and uncovering respective one of said openings with corresponding ones of said blades and with the one of said blades covering said one of said openings effectively captivating said resilient annular seal in sealing relationship with said counterbore.

13. In a spray nozzle that includes:

a housing having a fluid inlet and a first and a second group of fluid spray discharge outlets;

means of said housing defining a first flow path from said inlet to said first group of outlets and a second flow path from said inlet to said second group of outlets;

pulsation means in said first flow path for cyclically interrupting the flow of fluid from said inlet to said first group of outlets and cause a pulsating spray to be discharged therefrom;

said second flow path bypassing said pulsation means to cause a continuous non-pulsating spray to be discharged from said second group of outlets;

and control means for adjustably dividing flow from said inlet between said first and said second flow paths;

the improvement comprising:

a flow-directing plate mounted in said housing between said inlet and said outlets and having first and second openings therethrough respectively establishing communication between said inlet and said first and second flow paths, said first and second openings being located near the periphery of said plate and spaced apart around said periphery;

shutter means slidably mounted on said plate for coordinated movement into and out of overlying flow-blocking relationship with said openings between a first position wherein said second opening is blocked and flow from said inlet is directed through said first opening and a second position wherein said first opening is blocked and flow from said inlet passes through said second opening, movement of said shutter means between said positions progressively changing the amount of flow respectively delivered through each of said openings;

a generally tubular body constituting a portion of said housing and containing said pulsation means;

means defining first and second flow passages extending axially through said body and respectively constituting respective portions of individual different ones of said flow paths, said flow passages being adjacent to and spaced successively around the periphery of said body in communication with the respective ones of said first and second openings in said plate;

means defining an end wall of said body through which said second flow path extends;

means in said housing defining a mating wall through which said second flow path extends;

an annular washer sandwiched between said end wall and said mating wall and having means defining apertures through which said first and second flow paths respectively extend;

(a) (b)

Disclosure of Teledyne patent No. 3,958,756, (a), with exploded view of Windmere SHOWER MAGIC, (b).

and a rib outwardly projecting from one of said walls into sealing engagement with said washer, said rib extending continuously around the general perimeter of said one wall and being disposed radially outward of one of said flow paths and radially inward of the other of said flow paths.

Further evidence of infringement of the third patent can be found, if it is needed, from comparative dissection of the Water Pik SHOWER MASSAGE and the Windmere SHOWER MAGIC. The SHOWER MASSAGE Model SM–2 is a clear embodiment of the third Teledyne patent. When the units are disassembled it is apparent that the units are part-for-part interchangeable. Even nonfunctional details on certain parts are faithfully copied by the Windmere unit. That the units are designed to operate in identical fashion is of course obvious.

Defendant does not deny infringement of the second patent, and after consideration of the numerous analytical diagrams presented by plaintiff, the court concludes that likely infringement of the second patent has been demonstrated as well.

Defendant's only denial of infringement concerns claims 1 and 12 of the first patent. He refers to claim 1 of the first patent as containing an "essential limitation" as follows:

a valve member mounted in said housing for rotation about said axis at a location between said inlet and said end wall, said valve member having a *valve port* establishing fluid communication between said inlet and a portion only of said orifices at all rotative positions of said valve member. (emphasis added).

In his inspection of the Windmere device, defendant's expert claims to find no "valve port" in the turbine or rotor.

Of course if the Windmere device contains no such valve port then the Teledyne device does not either, because the rotors or turbines in each device are virtually indistinguishable.

However, in each rotor, water passes through the spaces or gaps between the ribs or vanes not closed by a plate between certain ribs. The rotation of the valve periodically opens and closes fluid access to the several groups of fluid discharge orifices in the end plate and so produces a simulated pulsating spray.

A "port" is defined merely as "an opening in a valve face . . . ." See Webster's New World Dictionary of the American Language (1971). In view of this the use of "port" to describe the areas of the Windmere rotor that do not block the passage of water to the discharge orifices does not seem inappropriate, and defendant's assertion seems overly contentious and without merit. Accordingly, the court finds likely infringement of the first Teledyne patent as well.

## THE UNFAIR COMPETITION CLAIMS

Teledyne alleges that in marketing its spray nozzle, Windmere has engaged in unfair competition under state common law and under the Lanham Act, 15 U.S.C. Section 1051 et seq. Of primary importance to the unfair competition claims are the devices themselves.

After extensive research and development, Teledyne manufactured and marketed its Water Pik SHOWER MASSAGE Model SM–2. Protected by several U.S. patents, the design of the SM–2 was heralded as a substantial improvement by showerhead manufacturers. The SM–2 is a large plastic discharge nozzle designed to connect with ordinary ½" threaded showerpipes. Drilled in a flat black end plate are three groups of small discharge orifices from which a pulsating or intermittent spray can be made to flow. Around the circumference of the end plate are small notches that really are discharge holes for continuous spray. The device is finished in smooth, chrome-colored plastic throughout. A clear plastic ring encircling the unit near its center may be rotated to control the nature of the spray. A small black plastic ring visible from the discharge side contains lettering identifying the product and calibrating the position of the control ring: "THE SHOWER MASSAGE by Water Pik SPRAY COMBINATION Fast—MASSAGE—Slow."

# *by Water Pik*®
## Wall-Mount Model SM-2

The Windmere Unit, imported from an undisclosed manufacturing firm in Hong Kong, presents a virtually identical appearance. The units are of identical size, shape, and coloration. Although some of the chromed plastic on the exterior of the Windmere unit is ribbed (whereas the plastic exterior on the SM–2 is smooth throughout) and the pattern of the discharge orifices appears to differ in detail, neither difference is of any consequence to the overall impression of similarity. Lettering on the Windmere is of similar size and style to that on the Teledyne, the former proclaiming: "SHOWER MAGIC by Windmere SPRAY COMBINATION Fast—PULSE—Slow". As is evident from the comparison photographs, the units are difficult to distinguish.

734

The Windmere SHOWER MAGIC, top, and the
Water Pik SHOWER MASSAGE, bottom.

The Water Pik SHOWER MASSAGE, top, and the
Windmere, SHOWER MAGIC, bottom.

## COMMON LAW OF UNFAIR COMPETITION

Teledyne claims that Windmere engaged in unfair competition in copying the unpatented but characteristic shape, coloration, and lettering style of its model SM–2. This distinctive "trade dress" has, according to Teledyne, acquired "secondary meaning" in the marketplace as an identification of the Water Pik SM–2.

Defendant replies that any copying not otherwise forbidden by federal patent and trademark laws cannot be forbidden by the states, under the landmark *Sears-Compco* cases. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), *reh. denied* 376 U.S. 973, 84 S.Ct. 1131, 12 L.Ed.2d 87 (1964). *Compco Corp. v. Day-Brite Lighting Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), *reh. denied* 377 U.S. 913, 84 S.Ct. 1162, 12 L.Ed.2d 183 (1964).

In *Sears* the plaintiff Stiffel Co. had been granted design and mechanical patents on a pole lamp it designed and marketed. Sears thereafter marketed a "substantially identical lamp" at a lower price. Thereupon Stiffel sued upon patent infringement and unfair competition. The lower court held the patents invalid but upheld the unfair competition claim. The Seventh Circuit affirmed, but the Supreme Court reversed and held:

> That Stiffel originated the pole lamp and made it popular is immaterial. 'Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested.' . . . To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. 376 U.S. at 231–232, 84 S.Ct. at 789, 11 L.Ed.2d at 667.

In the companion case of *Compco*, the Supreme Court reversed a ruling which held that a distinctive configuration in plaintiff's fluorescent light fixture, which was the subject of an invalid design patent, could be protected by the common law of unfair competition. The Court held that any "secondary meaning" acquired by the configuration was irrelevant because the federal law had preempted the area entirely, and as the design patent had been held invalid, that law could not protect plaintiff at all.

■ The extent to which the state law or common law of unfair competition survived the *Sears-Compco* decisions is not entirely clear. But one area that unquestionably survived was the state's power to prohibit "palming off". As the *Compco* court stated,

> A State of course has the power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original. 376 U.S. at 238, 84 S.Ct. 782.

In the Fifth Circuit's recent decision in *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254 (5th Cir. 1971), the court held that the state law of unfair competition survived the *Sears-Compco* cases, and succinctly stated: "The gist of unfair competition in Florida is 'palming off'". 451 F.2d at 1262. Palming off of course is the attempt to sell one's product as that of another.

■ Thus, if it were established that defendants had *actually sold* the Windmere unit *as a Teledyne unit, Sears-Compco* would not stand in the way of an injunction. As the Fifth Circuit recognized in *Bunn*,

> [o]ne may be perfectly within his legal rights in producing an item and yet well without them in his method of selling it if he markets his own item in such a way that there is likely confusion as to source of manufacturer. 451 F.2d at 1263.

The rule was stated as early as 1917 in the celebrated case of *Crescent Tool Co. v. Kilborn & Bishop Co.*, 247 F. 299, 301 (2d Cir.

1917), where Judge Learned Hand remarked:

> The defendant . . . may copy the plaintiff's goods slavishly down to the minutest detail; but he may not represent himself as the plaintiff in their sale.

Plaintiff claims that Windmere has been guilty of this type of palming off and presents evidence that a large western retailer had used, mistakenly or otherwise, a picture of the Teledyne SM–2 in advertising the Windmere device. Defendant responds that it cannot be responsible for the actions of the retail stores it sells its product to.

Whereas it is true that defendant does not control a retailer's advertising, and no evidence has been submitted to implicate defendant in a conspiracy with that store, this does not mean that defendant may not be liable as a "contributory infringer." In the landmark case of *Reid, Murdoch & Co. v. H. P. Coffee Co.*, 48 F.2d 817 (8th Cir.) *cert. denied*, 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529 (1931), the Eighth Circuit held that the manufacturer of a coffee can labeled "MONARCH" was liable on unfair competition grounds to plaintiff, who had used the "MONARCH" label previously, when retailers advertised the coffee cans as "MONARCH" without further identification.

> *The acts of these retail merchants might well have been anticipated by the defendant. These goods were supplied by the defendant for the purpose of being resold on the market, and use of the word "Monarch" by it made it possible for the retail merchants to commit a fraud upon the public to the injury of the plaintiff.* . . . (numerous cites)

Defendant's contention in the instant case is effectively answered in the opinion by Mr. Justice Holmes in *New England Awl & Needle Co. v. Marlborough Co.*, supra, [168 Mass. 154, 46 N.E. 386,] where it is said: "They knew that they were putting the power to do so into the retail dealers' hands. It hardly can be doubted that they contemplated that the wholesale dealer at whose request they put up their awls in this form, with full knowledge of the plaintiff's prior use, would or might try to deceive the public, and whether they did or not is immaterial.

The same rule is announced in *Amoskeag Mfg. Co. v. David Trainer*, supra, [101 U.S. 51, 25 L.Ed. 993,] where it is said: "Neither will the complainant be deprived of remedy in equity, even if it be shown by the respondent that all the persons who bought goods from him bearing the trademark of the real owner were well aware that they were not of the complainant's manufacture. *If the goods were so supplied by the wrong-doer for the purpose of being resold in the market, the injury to the complainant is sufficient to entitle him to relief in equity.*" 48 F.2d at 820 (emphasis added)

██ Disregarding contributory infringement, in considering "palming off" the court is not limited to evaluation of the subjective intent of the copier. It would be difficult to obtain evidence of such intent beyond the self-serving affidavits of the parties themselves. Thus, although defendant pleads that it "had no desire or intention to 'palm off' or have the 'SHOWER MAGIC' product confused with the plaintiff's Model SM–2", the court is not foreclosed from presuming defendant's intent from defendant's actions and from the chosen configuration of its product.

in *Socony-Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 635 (6th Cir. 1940), the court stated:

> The question of intent to deceive is involved though it is not necessary to prove it by direct evidence. It *may be inferred from circumstances and will be presumed where the resemblance is patent and the probability of confusion is obvious.*
>
> . . . With a practically unlimited field of distinctive names, shapes, sizes and colors of packages open to appellant for use when it entered into the manufacture and sale of the same product in which appellee was dealing, the fact that

it chose to use a package of the same shape and size with the contents of substantially the same color as appellee's, is weighty evidence that appellant did so because of the good will earned by appellee and the high regard which her product had established in industry. (emphasis added)

In this case, there can be virtually no doubt that defendant consciously imitated plaintiff's spray nozzle. The Florida Supreme Court in *Sentco, Inc. v. McCulloh*, Fla., 68 So.2d 577, 580, approvingly cited the case of *Wesson v. Galef*, 286 F. 621, 624 (S.D.N.Y.1922) in which Judge Learned Hand had concluded:

"There appears to me not the slightest question that all the infringing revolvers were deliberately made for the purpose of imitating a model of the plaintiff". In the case of *Galef* and *Newmark*, they correspond in dimension even by gauge, *a coincidence wholly impossible in the absence of conscious imitation.* In the case of *Gluck*, the visual similarity is as complete. Such things do not happen because manufacturers are merely following old patents.

*Little identical features in the two lay the matter beyond doubt, if doubt could remain.* (emphasis added) 68 So. at 580.

Plaintiff had clearly set forth examples of "little identical features" that have been copied by the Windmere unit:

(A) a control ring assembly, each having an integrally formed gear with 44 teeth and a flange of the same depth,

(B) a driving pinion having 20 teeth formed thereon,

(C) a connecting tube member having internal and external threads of the same pitch and the same modification at crest and root, and eight ribs integrally formed on the smallest inner diameter,

(D) a pinion having 12 teeth formed thereon,

(E) a shutter plate having an internal ring gear with 76 teeth integrally formed thereon,

(F) a flow-directing plate having identically located radially projecting tabs or keys formed on the outer periphery thereof, and three stop ribs also located in the same location and of the same configuration.

When palming off is to be *presumed* from conscious imitation, however, one must be sensitive to the implications of *Sears* and *Compco.* It may violate the spirit if not the letter of these pre-emption cases to hold that a state may presume palming off from (and thus forbid) the imitation of features *protected* or *protectable* by federal patent or trademark laws. This is a close question that need not be decided here, for there is ample evidence that Windmere has consciously imitated features of the SM–2 that are *neither* patented or patentable but serve only to indicate origin or to identify the product. And to be sure, conscious imitation of these nonfunctional features that serve only to identify is much stronger presumptive evidence of palming off than imitation of more functional features.

Defendant argues that such features as the overall shape of the units are indisputably functional, and in fact overall shape is mentioned in several of Teledyne's patents. In addition, certain features of the Windmere unit appear to be designed to distinguish rather than copy the SM–2. The chrome-colored surfaces on the body of the SM–2 are smooth, while those on the Windmere are ribbed. The end plate in the Teledyne unit has three distinct groups of discharge holes, while that of the Windmere device appears to have a continuous ring of holes (some are nonfunctional). Nonetheless, the color scheme and lettering size and style are virtually identical between the units, and certainly these are nonfunctional, nonesthetic features that serve only to indicate origin. One wonders why Windmere chose to copy these nonfunctional details if it did not intend to pass its product off as a Teledyne.

The lettering style alone may seem a minor feature, and various other features may be permissibly copied; however, given

the similarity of the permissibly copied features, the effect of the lettering style on overall impression is dramatic. *See Grove Press, Inc. v. Collectors Publication, Inc.,* 264 F.Supp. 603 (C.D.Cal.1967).

 Thus although the units are not identical, in their confusing similarity lies substantial presumptive evidence of palming off. As the court said in *Socony-Vacuum Oil Co. v. Rosen,* 108 F.2d 632, 636 (6th Cir. 1940):

> In cases of unfair competition it is unnecessary to show as close an imitation as in those of trademarks. If the simulation of the competitor in the dress of his goods is sufficient to deceive the average purchaser, unfair competition exists even though there are such differences in the imitation as would preclude a claim of infringement of a trademark.

*See also El Modello Cigar Mfg. Co. v. Gato,* 25 Fla. 886, 7 So. 23, 27 (1890); *Frito-Lay, Inc. v. So Good Potato Chip Co.,* 540 F.2d 927, 931, 191 U.S.P.Q. 560, 563 (8th Cir. 1976).

 Defendant vehemently maintains, however, a proper designation of origin, "SHOWER MAGIC by Windmere" is prominently displayed on its spray nozzle. Some courts have held that a correct display of origin on the product itself precludes a finding of "palming off." In *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 310 (2nd Cir. 1972), for example, the Second Circuit remarked that "there is hardly likelihood of confusion of palming off when the name of the manufacturer is clearly displayed." The court cannot subscribe to such a broad conclusion. Circumstances could arise where the proper trade name was displayed so inconspicuously or was so similar to the trade name of the opponent's product that all but the most sharp-eyed consumers would buy the copy as the original. Whereas the two units may be distinguishable on close examination the Windmere's overall similarity to the Teledyne seems beyond question calculated to deceive. *See Loctite Corp. v. B. Jadow & Sons, Inc.,* 177 U.S.P.Q. 410 (S.D.N.Y.1973).

Defendant next asserts that no palming off can be presumed because the units are sold in distinctively different packages. Windmere's blue and white box bears little resemblance to Teledyne's white styrofoam display. However, a large picture of the Windmere unit is printed on its box, and the Teledyne display is hinged to be displayed half-open, exposing the SM–2 within. In addition, retailers often remove a sample unit for consumer inspection. Accordingly, customer confusion is still likely through the packaging of the Windmere and Teledyne units is dissimilar.

Finding as it does that defendant's blatant imitation of all features of plaintiff's product, including features unprotectable by patent and serving only to designate origin, provides presumptive evidence of palming off, the court views it unnecessary to decide whether a purely innocent copier could be enjoined from causing customer confusion. Likewise, the Court need not address the Lanham Act claim nor the other causes of action asserted by plaintiff, for the evidence is sufficient to conclude that plaintiff will likely succeed in its claim of unfair competition.

## IRREPARABLE INJURY, PUBLIC INTEREST AND COMPARATIVE HARM

 Proof of irreparable harm is a requirement for issuance of a preliminary injunction. *Lawrence v. St. Louis-S.F. Ry.,* 274 U.S. 588, 592, 47 S.Ct. 720, 71 L.Ed. 1219 (1927). Harm is irreparable when it cannot be compensated adequately in money damages. *Nuclear-Chicago Corp. v. Nuclear Data Inc.,* 465 F.2d 428 (7th Cir. 1972).

In patent infringement cases, 35 U.S.C. Sec. 283 provides:

> The [Civil] courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent violation of any right[s] secured by patent, on such terms as the court deems reasonable.

To be sure, Windmere *may* be able, after the conclusion of the suit to respond to the substantial damages that may have accu-

mulated by that time. However, Teledyne has demonstrated that its patents are likely valid and infringed; to permit Windmere to infringe during the pendency of the lawsuit would in effect grant Windmere a license valid as long as it can continue to contest this suit. Others may be tempted to begin infringement on these terms as well. *See Eli Lilly & Co. v. Milan Pharm., Inc.,* 169 U.S.P.Q. 32 (N.D.W.Va.1968). Furthermore, the court finds the public interest in this case to lie in upholding the patent laws against such deliberate infringers as the instant party.

■ In the unfair competition case, the solvency of Windmere and whether that company could respond in damages to judgments on the merits of patent infringement and unfair competition need not be considered, because over and above money damages, Teledyne has established likely damage to its reputation. *See Carte Blanche Corp. v. Carte Blanche, Inc.,* 186 U.S.P.Q. 91 (S.D.Fla.1965); *H & R Block, Inc. v. H & R Block,* 188 U.S.P.Q. 309, 311 (S.D.Fla.1975).

■ In essence, Teledyne argues that because the Windmere unit is similar in appearance to the SM–2 and yet markedly inferior in construction to that unit, customers will buy the Windmere thinking it is a Teledyne, will suffer dissatisfaction because of the inferior quality of the Windmere, and will attribute their dissatisfaction to Teledyne. This, they argue, will irreparably damage Teledyne's reputation. The court agrees that the units are confusingly similar, as is detailed elsewhere in this opinion. However, no convincing evidence has been produced bearing on the quality levels of the respective products nor on the probabilities they will malfunction in service. A certain amount of offhand, undocumented "testing" was performed, but the court is not prepared to rule on the quality question at this stage of the trial. Nonetheless, a showing that the Windmere product is inferior is not necessary to establish irreparable injury. Plaintiff will sustain injury if customers might attribute the goods of another to itself, and this injury is by its very nature irreparable, since no payment of money damages in itself can abate the confusion.

The Windmere unit is new on the market. No records have been introduced to show that it was ever tested by its manufacturer at all. In contrast, Teledyne has shown that its quality control and testing program is extensive. Teledyne might find it impossible to accumulate quality data on the Windmere unit without months, or even years of test and observation. If Teledyne is required to establish convincingly that the Windmere device is inferior before irreparable injury could be found, it might be impossible to issue a preliminary injunction until it is too late. Teledyne should not be required to endure the likelihood that Windmere customers will attribute that product to Teledyne during the pendency of the suit if there is more than even a slight possibility that the Windmere unit will prove out inferior and cause dissatisfaction to be attributed incorrectly to Teledyne. *See Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 324 F.Supp. 715 (S.D.Fla.1971), *vacated on other grounds* 460 F.2d 1096 (5th Cir. 1972).

■ As the court stated in the trademark case of *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971):

Where there is, then, such high probability of confusion, injury, irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is awful difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of the product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. *Id.* at 1195.

■ Along similar lines, the court finds that customer confusion is by its very nature against the public interest. Implicit in

the unfair competition laws is the laudable goal of preventing confusion in the market place over the source of goods.

Finally, the court must compare the harm to plaintiff were a preliminary injunction not to issue with the harm to defendant were the court to grant this equitable remedy. The question is undoubtedly a close one, but if the plaintiff has affirmatively demonstrated likely success on the merits, irreparable injury, and the furtherance of the public interest, an injunction otherwise deserved should not be withheld merely because it might also harm the defendant. To be sure, from the evidence presented, neither corporation is in danger of bankruptcy from any decision of this court.

Windmere never has invested in design and production of its spray nozzle and in fact has only recently begun to market it. Teledyne expended substantial sums in the development of the SM–2 which has been sold for several years. Windmere has not sought to identify its corporate name with its product, whereas Teledyne has engaged in substantial advertising to that effect. Furthermore, defendant, a newcomer in the field, has an affirmative duty to select a dissimilar trade dress or product appearance to avoid confusion. *Jockey Int'l. Inc. v. Burkhard,* 185 U.S.P.Q. 201 (S.D.Cal.1975). Finally defendant was fully aware of plaintiff's product when it decided to market a confusingly similar version, so it can scarcely complain of any harm befalling it on account of that decision. *See Corning Glass Works v. Jeannette Glass Co.,* 308 F.Supp. 1321, 1324 (S.D.N.Y.1970), *aff'd.* 432 F.2d 784 (2d Cir. 1970). The evidence is sufficient to allow the court to conclude that the harm Teledyne will suffer were an injunction denied would outweigh that suffered by Windmere were an injunction issued.

Accordingly, the court concludes that Teledyne has demonstrated its entitlement to a preliminary injunction based both on claims of patent infringement and on claims of unfair competition. Such an injunction shall issue forthwith.

## ORDER GRANTING TEMPORARY INJUNCTION

THIS CAUSE came on for consideration upon plaintiff Teledyne Corporation's motion for a preliminary injunction to enjoin defendant Windmere Corporation from infringing several United States patents owned by Teledyne and to enjoin defendant from competing unfairly with plaintiff. The court, having considered the oral presentations of the parties at two hearings, having examined the legal memoranda presented, and having evaluated the voluminous affidavits and evidentiary exhibits presented, finds and concludes, for reasons assigned in the accompanying memorandum opinion, that Teledyne's motion should be granted and the preliminary injunction should issue to enjoin both patent infringement and unfair competition. It is therefore ORDERED and ADJUDGED that defendant Windmere Corporation is hereby ENJOINED from selling, distributing, advertising, or marketing

(a) any spray nozzle identical to or similar to that spray nozzle known as the Windmere SHOWER MAGIC and introduced into evidence as defendants' exhibit # 3.

(b) any spray nozzle with internal parts identical or substantially similar to that spray nozzle mentioned above; or

(c) any spray nozzle with overall shape, color, lettering style, or any combination of these, identical to or substantially similar to that spray nozzle mentioned above.

The injunction shall remain in force for the duration of this action until final resolution on the merits, unless otherwise extended or terminated by order of this court.