*of Springfield, Mo.,* 428 F.2d 1375 (8th Cir. 1970), *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605 (8th Cir. 1972).

Accordingly, the defendants' motion to dismiss Count I is sustained on the basis set out above, and plaintiffs are given twenty (20) days within which to file an amended petition in line with this memorandum.

■ With respect to Count II, the briefs of the parties indicate similar suits involving this same question have been filed against the defendants in several districts around the country. An examination of *McNamara v. Johnston,* 522 F.2d 1157 (7th Cir. 1974), discloses that case to be one on all fours with Count II of this action, except for some of the named parties. It would be repetitious for this Court to deal with the question here. Suffice it to say that the district court dismissed the complaint for failure to state a claim (D.C., 360 F.Supp. 517), the Seventh Circuit Court of Appeals affirmed, and the Supreme Court denied certiorari (425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761).

Accordingly, the defendants' motion to dismiss Count II for failure to state a claim upon which relief can be granted under Section 501 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501, is sustained.

**MOUNT SINAI MEDICAL CENTER OF GREATER MIAMI, INC., Plaintiff,**

**v.**

**F. David MATHEWS et al., Defendants.**

**No. 73–804–Civ–JLK.**

United States District Court,
S. D. Florida,
Miami Division.

Dec. 30, 1976.

Lewis I. Horwitz, Broad & Cassel, Bay Harbor Island, Fla., Burton A. Schwalb, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for plaintiff.

Asst. U. S. Atty. William R. Northcutt, Miami, Fla., for defendants.

## ORDER GRANTING TEMPORARY INJUNCTION

JAMES LAWRENCE KING, District Judge.

Plaintiff Mount Sinai Hospital of Greater Miami brought this action against the Sec-

retary of Health, Education and Welfare ("HEW") and Blue Cross of Florida, Inc. to enjoin HEW from recouping alleged Medicare overpayments by withholding future payments by 15%. On February 6, 1974, this court issued a permanent injunction against HEW, holding *inter alia* that the District Court had federal question jurisdiction over the action, that the claim was not barred by sovereign immunity, and that nonstatutory review of the government's action was proper under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* In addition, the court held that the comprehensive Medicare statutory scheme, 42 U.S.C. § 1395 *et seq.*, proscribed common law recoupment for overpayments resulting from a hospital's providing services not covered by Medicare. *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 376 F.Supp. 1099 (S.D.Fla.1974). On appeal, the Fifth Circuit Court of Appeals reversed and remanded for further proceedings holding that HEW under the common law could setoff future payments to recoup amounts owed to it, notwithstanding statutory and regulatory provisions of the Medicare program. *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, *reh. den'd en banc with opinion* 522 F.2d 179 (5th Cir. 1975), *cert. den'd* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). Now, on remand, Mount Sinai moves this court to re-institute a temporary injunction against HEW until the conclusion of this trial and final adjudication of the controversy. For reasons discussed below, this court grants the injunction.

 A temporary injunction is an extraordinary equitable remedy available at the sound discretion of the District Court, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), when the record shows that irreparable injury to the movant during the pendency of the action will likely impair the court's ability to render a meaningful decision on the merits. *Meis v. Sanitas Service Corp.*, 511 F.2d 655 (5th Cir. 1975). In evaluating the propriety of a temporary injunction, the following factors are properly considered: (1) the plaintiff's likelihood of sustaining irreparable injury; (2) whether issuance of the injunction is in the public interest; (3) whether the harm to the defendant from the injunction would substantially outweigh the harm to plaintiff were the injunction not issued; (4) whether plaintiff is likely to succeed in trial on the merits. *Allison v. Froehike*, 470 F.2d 1123 (5th Cir. 1972).

## I. IRREPARABLE INJURY, PUBLIC INTEREST AND RELATIVE HARM

Mount Sinai Hospital is a large (700 bed) acute care, non-profit institution located on Miami Beach. Because of the advanced age of the hospital's census, the majority of the hospital's use in recent years has been for Medicare patients. Recent figures indicate that almost 70% of the total hospital operating expenses of over $1 million per week are obtained from Medicare revenues. In addition it is claimed that in terms of the amount of services rendered, Mount Sinai is the largest provider of Medicare services on the Atlantic seaboard. The record reveals that in addition to providing hospital care for the elderly, Mount Sinai furnishes various health care facilities that are unique in the community. Outpatient and dental clinics, as well as a complete 24-hour emergency facility, are provided. These and other programs more integral to the hospital, including departments of pediatrics and obstetrics, a program of free community medical services, and a thorough medical training program, are maintained as services to the community, sometimes at a substantial monetary loss. In addition, the hospital undertakes considerable research in various medical specialities and maintains a position on the threshold of technological development in nuclear medicine, having the only cyclotron in the area (and one of the four in the nation) in neurology, having developed a "brain pacemaker" for the treatment of certain neurological conditions, and in cardiology, having pioneered several surgical developments in that field. Services from these tremendously expensive technologies are available to patients in need, regardless of their abilities to pay.

In spite of the size and development of the hospital, its financial history has been one of continued cash deficits and continuous borrowing. Within the past year the hospital instituted severe cutbacks in employment and equipment in order to improve its fiscal posture. Nonetheless the hospital continues to borrow against future depreciation reserves in order to meet day-to-day expenses and seems to possess less than a million dollars cash-on-hand (or less than one week's operating expenses) that is not "earmarked" for special purposes.

■ To recover previous Medicare overpayments alleged to total some $6.3 million, HEW indicated its intention to withhold future payments by 15% until repayment is complete. Under recent estimates, this would reduce Mount Sinai's income by some $375,000 per month or $4.5 million per year. Whereas this court does not necessarily agree that such a withholding would be, in the words of plaintiff's witness "catastrophic" to the hospital, nonetheless the court is satisfied as a matter of fact that irreparable injury to the hospital would ensue were the injunction not granted. Evidence has been presented that because of the hospital's shortage of cash-on-hand, this withholding would render the hospital incapable of continuing operations in a normal manner. Apparently Mount Sinai would be forced seriously to curtail services, especially the "loss" services mentioned above, and as well, to meet liquidity needs, to engage in substantial borrowing from financial institutions, perhaps at disadvantageous rates. Furthermore, the hospital would be forced to lay off staff and to delay purchase of new or replacement equipment, all of which would jeopardize the hospital's position of leadership in various medical specialities.

■ In addition, the court is of the opinion that the public, at least in the greater Miami area, has a considerable interest in, and derives substantial benefit from, the operation of the hospital, both as a provider of medical care and as a facility for research and training in the medical arts. For this reason, the court concludes that the public interest would best be served through enjoining HEW from any withholding of Medicare funds that might tend to jeopardize or curtail the hospital's operation.

■ Lastly, HEW's fiscal posture, while certainly unenviable due to stupendous overruns in various social welfare programs, seems less precarious than that of the hospital, at least in the short run. For this reason the court concludes that the injury to HEW, were an injunction granted, would not be as severe as that to the hospital, were an injunction denied. In evaluating the propriety of an injunction, there remains to be considered, therefore, only Mount Sinai's likelihood of prevailing at trial on the merits.

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

The Medicare Act, enacted as Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, provides a federal health insurance for the aged and other qualified individuals. Under part A of the Act, 42 U.S.C. §§ 1395c–1395i–2 (Supp. III), eligible beneficiaries are provided with hospital and related post-hospital services free of charge. Hospitals, or "providers of services", 42 U.S.C. § 1395x(u), are compensated for the "reasonable cost" of services that qualify under the Act. *See* §§ 1395x(v), f(b); 20 C.F.R. § 405.401 *et seq.* Sections 1395d and 1395y define services qualified under the Act, but in no case are services qualified, and in no case will a provider of services be reimbursed for services "which are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1).

For a thorough discussion of the Medicare statutory scheme see *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 336–40 (5th Cir. 1975).

On May 10, 1973, Blue Cross of Florida, Inc. who was functioning as a "fiscal intermediary" under the Act, serving as Hew's agent for day-by-day administration of the program, 42 U.S.C. § 1395h, informed

Mount Sinai that as a result of an investigation conducted on a sample of cases from the hospital's records, Mount Sinai had performed and collected Medicare payments for, in numerous instances, services that were medically unnecessary. Blue Cross thereupon informed Mount Sinai that that institution had been overpaid some $6.3 million from 1966 to 1971, and that HEW intended to recoup these overpayments through a 15 per cent reduction in future Medicare payments. The hospital then brought this action seeking to enjoin HEW from this withholding.

This court's decision and the Fifth Circuit's appellate ruling are described above in this opinion.

The parties disagree, however, on the issues to be decided by this court on remand. Mount Sinai argues that the Fifth Circuit decided only that common law recoupment could coexist with the Medicare Act, not that common law recoupment was proper in this particular case. Rather, Mount Sinai asserts, it had not had the opportunity through discovery to frame the case with particularity at the time of the earlier proceedings before this court and before the Fifth Circuit. In fact, the hospital contends, HEW should be estopped from attempting to recoup previous overpayments, in this case, because it reviewed and approved the payments as submitted. HEW replies that because they ostensibly followed Medicare statutory procedures, and because these procedures have been found consistent with common law recoupment by the Fifth Circuit, then no issue of estoppel can exist after the appellate decision. Both parties agree, however, that the Fifth Circuit expressly did not decide, but left for this court to decide on remand, the issue of whether Mount Sinai was accorded the extent of procedural due process appropriate in the HEW determination of overpayment.

If plaintiff can demonstrate likelihood of success on the issue of procedural due process, decision of whether other issues have been left open by the Court of Appeals would be unnecessary. The court therefore will consider the due process issue.

The record reveals that on June 19, 1972, Blue Cross and Mount Sinai met to discuss certain charges of medical malpractice, including the furnishing of medically unjustified services, made by certain physicians against the hospital. After this meeting, Blue Cross proceeded to conduct a preliminary investigation, interviewing several members of the Mount Sinai staff. Subsequently, Blue Cross notified the hospital on June 30, 1972, that an audit of greater depth and scope would be indicated. Thereupon Blue Cross advised the hospital on July 28, 1972, to select one of three alternative sampling audit procedures, one involving a sample of an entire representational year, one involving smaller samples of each problem year, 1966–1971 inclusive, and one involving a "full sample" of each problem year. On August 19, 1972, Mount Sinai met with Blue Cross and in that meeting opted for the first alternative. The representational year chosen was 1970, and approximately 850 charts would be reviewed.

According to Blue Cross, the sample auditing procedure was conducted as planned. In December 1972 and again in January 1973, between 80 and 100 physicians from the Florida Medical Foundation Peer Medical Review Committee met to evaluate the sample patient records. The review procedure was described by Blue Cross as follows:

> Generally, the reviewing physicians were divided into groups of three or four, with a State Peer Review Committee member seated with each group. The groups were selected in such a fashion that specialists, such as cardiologists, reviewed records involving their specialities. Some of the groups reviewed each hospital chart as a group and reached their decision. The members of other groups reviewed the hospital charts independently. In either event, each finding that one or more days of hospitalization or one or more services were not medically necessary could only be made upon the unanimous agreement of each of the physicians reviewing each chart. If only one out of the four physicians, for example, determined that a particular day of ancil-

lary service was medically necessary, no disallowance was recommended despite the majority view of three out of four that such a day or ancillary service was not medically necessary. Members of Mount Sinai Staff served as reviewing physicians.

After the review was completed, the Blue Cross Utilization Review Department performed statistical analysis to extrapolate the findings for the sample year to all problem years, 1966–1971 inclusive. Conclusions from this analysis were communicated to Mount Sinai on March 28, 1973. Thereafter, in a meeting on April 3, 1973, Blue Cross delivered the following:

(1) A 71-page tabulation of the specific cases involving non-covered days of hospitalization or non-covered procedures or services, setting forth the patient's name, the admission date, the Mount Sinai medical record number, and the days, services or procedures found to have been not medically necessary and therefore not covered by Medicare for each of these specific cases; and

(2) A 3-page summary of the statistical basis of the sample and its application to each year from 1966 to 1971 and the basis for the estimate of overpayment for those years at $6,380,587.40.

On April 12, 1973, Mount Sinai submitted a statement objecting to the sampling procedure, and to the lack of any evidentiary hearing, and documenting the financial condition of the hospital. Several days later Blue Cross notified the hospital that its statement would be evaluated and invited the hospital to submit by April 25 any additional evidence it desired. A meeting was held on May 1, in preparation for which, according to Blue Cross, the hospital had been requested to prepare and present whatever evidence or arguments appropriate. At the May 1 meeting and shortly thereafter, the hospital submitted statements alleging financial hardship and objecting to the proposed action of Blue Cross. Thereafter Blue Cross sent the letter of May 10, informing the hospital that it would begin withholding funds to recoup the previous overpayments.

■ Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments." *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). HEW agrees that the continued receipt of Medicare payments constitutes "property" within the meaning of due process, but asserts that the administrative procedures followed in this case were adequate under the Constitution and the relevant case law. Plaintiff argues that, in effect, due process requires in this case an oral hearing during which Mount Sinai could present evidence and cross-examine witnesses.

■ No statute or regulation, of course, could mandate procedures that fail to comply with due process requirements of the Constitution. Plaintiff, however, suggests that a constitutional inquiry may be unnecessary because in this case HEW failed to provide the due process protection that Congress itself intended. But this court held in our earlier ruling that no statute or regulation in the Medicare act precisely governs HEW's attempted recoupment of overpayments rendered due to unnecessary services. The Court of Appeals did not disturb this ruling, and the parties seem to concur as well. However, plaintiff cites several statutory provisions mandating certain procedural guarantees that it feels apply to situations so similar to the present case that congressional intent to provide, for instance, an oral evidentiary hearing, should be inferred by analogy. For example, when a provider is threatened with termination from the Medicare program for providing "unnecessary services," the Professional Standards Review Law, 42 U.S.C. § 1320c *et seq.* sets forth a procedure, including an oral hearing, for adjudicating claims against the provider. *See* 42 C.F.R. §§ 101.1403 *et seq.* Likewise, the 1972 Amendments to the Medicare act, Pub.L.

No.92–603 (October 30, 1972), although they are expressly inapplicable to payments made to providers before their enactment, incorporated two provisions into the Act that apply to situations similar to the present one. The first, codified as 42 U.S.C. § 1395y(d) provides that any provider who HEW has determined has furnished services "substantially in excess of the needs of individuals" "shall be entitled to reasonable notice and opportunity for a hearing." 42 U.S.C. §§ 1395y(d)(1)(C), (d)(3). Another, codified as 42 U.S.C. § 1395pp, provides that in certain cases when a provider knowingly furnishes unnecessary services, he is to be accorded the same due process protection as would a beneficiary. 42 U.S.C. § 1395pp(d); *see also* 42 U.S.C. § 1395ff(b). Detailed procedural requirements in analogous statutes may be persuasive if it appears Congress overlooked these provisions in the instant case; given the comprehensive nature of the Medicare act this seems hardly likely. Instead, one could turn plaintiff's argument around and contend that any absence of procedural requirements in the act was an intentional one. Consequently, citation to analogous statutes cannot be significant one way or the other. Likewise, the 1972 Amendments, expressly inapplicable retroactively, are not in any way indicative of Congressional intent before their enactment. There being no convincing index of Congressional intention of the procedural safeguards to be followed in provider appeals from "unnecessary service" determinations, the court must consider directly the constitutional requisites of procedural due process.

A cornerstone of plaintiff's constitutional argument is the decision of *Coral Gables Convalescent Home, Inc., v. Richardson,* 340 F.Supp. 646 (S.D.Fla.1972), where the Southern District held that due process required that a hospital be afforded a complete evidentiary hearing before a fiscal intermediary could begin withholding Medicare funds for previous overpayments. Although the overpayments sought to be recouped in *Coral Gables* originated as compensation beyond the "reasonable cost" of Medicare service, *see* 42 U.S.C. §§ 1395x(v),

f(b), (and not as in the instant case, as compensation for services not covered by the Medicare program, see 42 U.S.C. §§ 1395d, 1395y) we find that learned opinion persuasive (but not controlling). However, recent case law may have diminished its value as precedent to the instant case.

*Coral Gables* relied principally upon *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), a watershed case in the due process area. In *Goldberg* the Supreme Court held that a beneficiary could not be denied welfare payments without an oral evidentiary hearing. The test applied in *Goldberg* was the so-called "brutal need" test, where judicial due process safeguards do not attach unless the plaintiff is "liable to sustain grievous loss" by the government's determination. *See Wright v. Finch,* 321 F.Supp. 383, 386 (D.C.D.C.1971). *Coral Gables* went beyond *Goldberg* and did not require a showing of "brutal need" before attaching procedural due process safeguards.

HEW argues that the Supreme Court's most recent decision in the due process area, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), jeopardizes the continued viability of the *Goldberg* line of cases. In *Eldridge* due process did not require an oral evidentiary hearing before the government could terminate Social Security disability benefits to a beneficiary. According to the *Eldridge* court, *Goldberg* is distinguishable primarily because the primary evidence in *Eldridge* was "routine, standard, and unbiased medical reports" (not lay testimony as in *Goldberg*) in relation to which "[t]he potential value of an evidentiary hearing [was] substantially less . . . than in *Goldberg.*" 96 S.Ct. at 907. A further distinguishing factor was that "the degree of potential deprivation [was] likely to be less [in *Eldridge*]." *Id.* at 906.

It appears that even if *Eldridge* is honestly distinguishable from *Goldberg,* those factors that distinguish it cut against plaintiff's argument. As HEW asserts, Mount Sinai can hardly argue its "degree of potential deprivation" with the same conviction it

could be argued by a lone welfare beneficiary threatened with loss of his welfare stipend. At the very least, *Eldridge* can be seen as an affirmance of the "brutal need" test and thus as calling into question any expansion of *Goldberg* discarding this test.

■ Nonetheless, it would be premature for this court to determine, at this stage in the proceedings, exactly what due process procedures are mandated by the Constitution in a case of this type. For plaintiff, in requesting a temporary injunction, need not show that he is currently entitled to judgment, but need only raise "serious and substantial questions, indicating likely success on the merits." *County of Alameda v. Weinberger*, 520 F.2d 344, 351 (9th Cir. 1975). At oral hearing on this motion, plaintiff, although according to him aggrieved by still-incomplete discovery even after the several years of pendency of this action, brought forth certain evidence that seems to raise "serious and substantial questions" to this forum.

■ Specifically, plaintiff introduced evidence of communications between HEW and Blue Cross supposedly made just before Blue Cross' letter of May 10, 1973, to plaintiff, wherein Blue Cross stated the method and conclusions of its overpayment determinations. In the exchange between HEW and Blue Cross, Blue Cross supposedly admitted that based on the study it had conducted until that date, it could honestly endorse no "determination" of overpayment, but that additional evidence would need to be obtained. HEW supposedly indicated to Blue Cross that the latter would, in the imperative, communicate to the hospital that such a "determination" had been made. Although the court expresses no opinion on the sufficiency or reliability of this evidence at this time, such evidence would be significant if true, for the hospital had been informed, and undoubtedly believed, that any determinations of overpayment had been made by the disinterested fiscal intermediary Blue Cross and not by the adverse party HEW.

Further evidence presented at oral hearing raised some question of whether during Blue Cross' audit of sample hospital cases conducted in December 1972 and January 1973, complete unanimity of the reviewing physicians was in fact obtained for each determination of overpayment, as Blue Cross had represented both to plaintiff in numerous communications and to this court and the Court of Appeals. For several cases which had been flagged as instances of overpayment by Blue Cross, documents purporting to be reports from the reviewing physicians were produced. Some of these reports contained dissenting views that no unnecessary (and thus noncovered) services had been performed, thus suggesting that the opinion in these cases had not been unanimous. There was, however, much confusion surrounding the authorship of the reports, which confusion could not be erased by the reviewing physicians' themselves, as they were unavailable to testify, their identities remaining unrevealed by Blue Cross.

Without evaluating this evidence, the court is of the opinion that it raises "serious and substantial questions" of whether the procedure followed by HEW comports with *any* reasonable conception of procedural due process. This in no way indicates this court's disapproval (or approval) of the procedure of peer-group evaluation of a sample of cases, followed by statistical extrapolation of the result, to evaluate the extent of previous Medicare overpayments for unnecessary services. Indeed, as plaintiff admits, individual evaluation of each hospital case alleged to involve unnecessary services here would represent an intolerable administrative and judicial burden. In fact, a peer-group review procedure similar to the one allegedly employed by HEW here was authorized by Congress in the 1972 Medicare Amendments (inapplicable retroactively). *See* 42 U.S.C. § 1395y(d)(4). Nevertheless, in view of plaintiff's evidence, we cannot be sure at all but can only *speculate* what actual procedure HEW followed in this case. Hence, serious due process questions have been raised.

■ Similarly, the court does not hold that lack of unanimity in such a peer-group

review procedure in itself violates due process. But Mount Sinai justifiably relied upon HEW's representations that the procedure required unanimity of the reviewing physicians. If in fact, the procedure did not so require, the response of the hospital to the earlier communications of HEW might well have been different. Due process may not require unanimity or any other specific attribute (this the court does not decide), but due process certainly requires that the government's representations of the procedure it has followed be accurate and correct. Likewise, HEW may have the right to decide whether an attempt to recover alleged overpayments should be made, but it cannot represent to the hospital that the fiscal intermediary Blue Cross in fact made an independent decision.

Therefore, in view of the irreparable harm Mount Sinai is apt to suffer if HEW withholds some $370,000 per month of presently earned Medicare payments; in view of the importance of this hospital to the community and, thus, the public interest in the continued viability of Mount Sinai; in view of the lack of any immediate fiscal danger to HEW; and in view of the substantial and serious due process questions the hospital has raised concerning the propriety of the procedures employed by HEW in its determination of overpayment, this court does hereby

ORDER and ADJUDGE that Mount Sinai's motion for a temporary injunction be, and the same is, hereby granted. HEW shall not withhold, in order to recover alleged overpayments, any Medicare payments otherwise due the hospital, for the pendency of this action and until its final adjudication.

DONE and ORDERED in chambers at the United States District Courthouse, Miami, Dade County, Florida, this 30th day of December 1976.